HUMBLE GAS TRANSMISSION COM-
PANY, Plaintiff-Appellant,

v.

MISSISSIPPI POWER & LIGHT COM-
PANY, and Mississippi Valley Gas
Company, Defendants-Appellees.

No. 28557.

United States Court of Appeals,
Fifth Circuit.

July 14, 1970.

George F. Woodliff, Otis Johnson, Jr.,
Jackson, Miss., for plaintiff-appellant;
Heidelberg, Woodliff & Franks, Jackson,
Miss., of counsel.

Richard B. Wilson, Jr., Sherwood W.
Wise, Thomas G. Lilly, Jackson, Miss.,
for Miss. Power and Light.

John M. Kuykendall, Jr., Overstreet &
Kuykendall, Jackson, Miss., for Miss.
Valley Gas Co.

Before WISDOM, GEWIN and GOLD-
BERG, Circuit Judges.

GEWIN, Circuit Judge:

In 1949 the predecessors of Hum-
ble Gas Transmission Supply Company
(hereinafter, Humble) and Mississippi
Power and Light Company (hereinafter,
MPL) negotiated an exclusive natural
gas supply contract with an expiration

date of January 1, 1972. As last amended, the contract called for Humble to furnish natural gas via its Fowler-Baton Rouge System for MPL's Natchez Steam Electric Station. Humble instituted this diversity action in May 1969 to enjoin MPL from breaching this contract by purchasing natural gas for its Natchez station from Mississippi Valley Gas (hereinafter, Valley), and to secure a declaratory judgment as to the rights of the parties. The district court denied the requested injunction because it concluded that the parties had terminated their contractual obligations pursuant to an oral agreement reached on November 22, 1968. On appeal, Humble contends primarily that certain of the district court's findings of fact are clearly erroneous.[1] We affirm.[2]

Both MPL and Valley receive gas via Humble's Fowler-Baton Rouge line. The 1949 contract, as last amended, permitted MPL to take up to 20,000 MCF[3] per

1. Humble advances nine (9) allegations of error on appeal:

(1) The District Court's conclusion of law and judgment that there was an agreement of the parties to terminate the gas sale contract in issue and that said contract was terminated is unsupported by the evidence and contrary to the law.

(2) The finding by the District Court that there was a firm agreement to terminate the gas supply contract between Humble Gas Transmission Company and Mississippi Power & Light Company was clearly erroneous.

(3) The finding by the District Court that Mississippi Valley Gas Company, which obtained its entire supply of gas in the Natchez area from Humble Gas Transmission Company, was another supply of gas within the intent of the offer to terminate made by Humble Gas Transmission Company was clearly erroneous.

(4) The finding by the District Court that the offer to terminate the gas supply contract did not require an acceptance was clearly erroneous.

(5) The failure of the District Court to find that the offer to terminate the gas supply contract was effectively withdrawn was clearly erroneous.

(6) The finding by the District Court that there was nothing undercover or secretive about Mississippi Power & Light Company contracting with Mississippi Valley Gas Company for the purchase of gas being supplied to Mississippi Valley Gas Company by Humble Gas Transmission Company was clearly erroneous.

(7) The conclusion of the District Court that it was not necessary for the minds of the parties to have met in order for there to have been a termination of the gas sale contract was contrary to the law.

(8) The findings by the District Court that the contractual commitment of 20,000 MCF to Mississippi Power & Light Company was terminated when Mississippi Power & Light Company found another supply of natural gas on which it was willing to rely in place and stead of such commitment from Humble Gas Transmission Company was clearly erroneous.

(9) The District Court erred in dissolving the preliminary injunction, in failing to enter declaratory judgment holding the gas sale contract to be valid and enforceable, and in overruling plaintiff's motion to reinstate the preliminary injunction.

The first allegation is so broad as to encompass all aspects of the case and, therefore, it will not be dealt with specially. The final contention (No. 9) is not reached because of our decision to affirm the district court's finding of a termination agreement. Of the remaining seven (7) contentions, all but No. 7 challenge findings of fact. Contention No. 7 is totally without merit in view of the specific finding by the district court that:

The minds of the parties in this case in truth and in fact and in legal effect certainly met with the agreement that the contract in suit would be terminated just as soon as defendant got another supply of natural gas acceptable to it, and defendant got such acceptable supply of natural gas in a satisfactory volume and at a satisfactory price for an acceptable period of time.

2. MPL's contention that this case is moot because the event sought to be enjoined— MPL receiving gas from Valley—has taken place is meritless, See Porter v. Lee, 328 U.S. 246, 66 S.Ct. 1096, 90 L.Ed. 1199 (1946); Mills v. Green, 159 U.S. 651, 653-654, 16 S.Ct. 132, 40 L.Ed. 293 (1895); Ramsburg v. American Investment Company of Illinois, 231 F.2d 333, 336 (7th Cir. 1956).

3. MCF = thousand cubic feet.

day at a rate of 28.28 cents per MCF. Valley may take a maximum of 23,576 MCF per day from the line at 17.69 cents per MCF pursuant to Federal Power Commission Opinion No. 530 issued October 5, 1967.[4] The quantity and rate at which Valley takes its gas may be varied only by Commission order. No restrictions bind Valley in the use of its allotment of gas. Valley's need for gas varies drastically depending on the temperature, the greatest demand occurring during the colder months of a year.

In July 1968, Humble informed MPL that its reserves of natural gas feeding the Fowler-Baton Rouge line were seriously depleted and that peak hour demands on the line could not be met. Humble stated that it had obligations of approximately 90,000 MCF per day and could supply only 70,000 MCF per day. Beginning immediately and continuing for the next four months, Humble alternatedly threatened, cajoled and demanded that MPL officials either (a) terminate the '49 supply contract, or (b) renegotiate the '49 firm supply contract into an interruptible supply agreement.[5] The district court found that officials of Humble and MPL met on November 22, 1968 and agreed to terminate the '49 contract. Valley is presently supplying MPL with natural gas on an interrupti-

ble basis. Valley has available for sale to MPL an amount equal to the difference between the quantity of gas required for sale to its other customers and 23,576 MCF per day, or about 12,-000 MCF per day at 19.834 cents per MCF.

Humble first challenges as clearly erroneous[6] the lower court's finding that an agreement to terminate was reached at the November 22 meeting between Humble and MPL. The district court stated:

It was agreed by the parties at such meeting that the plaintiff [Humble] was running out of its supply of natural gas in this Fowler-Baton Rouge system and that it could no longer furnish defendant [MPL] natural gas under its commitment from said system and that the defendant [MPL] agreed to obtain another supply of natural gas for its Natchez plant as quickly as possible and that plaintiff should supply natural gas from its system as best it could until such gas from another supplier could be obtained and the transition accomplished in an orderly manner.

The court also found that the agreement was "substantially confirmed" in a letter dated November 25, 1968 from Humble to MPL.[7]

4. The Commission's Opinion was affirmed by this court, Mississippi Valley Gas Co. v. F. P. C., 398 F.2d 395 (5th Cir. 1968).

5. Humble's attitude is accurately reflected by the following letter via certified mail dated October 29, 1968 from Humble's secretary to the vice president of MPL:
In line with our recent discussions and your letter of October 11, 1968, we hereby propose that the cancellation date of captioned agreement be set at 7:00 A.M., C.S.T. on December 1, 1968.
If you are in accord with this proposal, please execute both copies of this letter in the space provided for your signature and return one copy to this office.
The offer contains no qualifying terms whatsoever.

6. The factual findings of a district court sitting without a jury are reversible only

if clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure.

7. We set the body of the letter out en toto because of the importance attached to it by Humble.
This will confirm the understanding reached with you and other representatives of Mississippi Power & Light Company in our meeting in your offices in Jackson, Mississippi, November 22, 1968.
Among other things we again discussed with you our shortage of gas supply on the Fowler-Baton Rouge System and advised that due to such shortage created by depletion of supply it will be necessary, in accordance with Article XIII of the contract dated June 30, 1949, upon notice given in due course at the time, to curtail or discontinue deliveries to your Natchez Gener-

Humble argues that the November 25 letter contradicts, rather than supports, the district court's finding that an agreement to terminate the 1949 contract was reached at the November 22 meeting. Before considering Humble's interpretation of the letter, we hasten to point out that the factual finding here in issue was not based solely on the letter. Lengthy testimony was presented by both parties as to what actually transpired at the meeting. Needless to say, it is replete with contradictions and inconsistencies. A perusal of the entire record convinces us that the district court's finding of an agreement to terminate is supported by substantial and persuasive evidence. The point here is that assuming Humble's interpretation of the letter is correct, it does not follow that the district court's findings are clearly erroneous.

█ We are convinced, nevertheless, that the letter does substantially confirm the November 22 agreement. The crucial paragraph, in Humble's estimation, provides:

In addition you agreed to proceed to obtain another supply of gas for the Natchez Generating Plant and in this connection we agreed to hold our offer open to terminate the existing agreement at the earliest date possible. Our offer to convert the existing agreement into an interruptible contract also remains open in the event you desire to elect that course of action.

According to Humble, this paragraph contains only alternate contingent offers and does not recite the terms of an agreement. With reference to the letter Humble states:

The obligations of each party of the November 22 meeting were contingent: that is, first MPL had to obtain another supply of gas and thereafter, upon acceptance of either of Humble's offers, Humble was obligated to terminate the contract.

Humble further explains:

[T]he language of the letter of November 22, 1968, plainly says that Humble *was making an offer to terminate* and, also, *making an offer to convert the contract into an interruptible contract.*

One of the most troubling aspects of this interpretation is that both offers are contingent on MPL's obtaining another supply of gas. And yet, if MPL secured another supply of gas, it would not need a second supply from Humble, especially an uncertain, interruptible supply. In addition, Humble's interpretation totally ignores the obvious implications of the word "agreed" as used in the "crucial" paragraph of the letter. Finally, why would Humble "offer" to hold open an offer? A simple offer would have been sufficient and would have remained open until revoked. The entire letter has all of the earmarks of exactly what it purports to be, the confirmation of an "understanding reached on November 22, 1968." In effect,

ating Plant. Such periods of curtailment or discontinued deliveries will be held to a minimum time consistent with peak demands on this system and the availability of gas supply.

We will strive to operate in such manner as to cause only curtailment of deliveries as opposed to total cessation of deliveries. This appears possible in the near future, however, we cannot at this time agree that total cessation will not be necessary.

You stated that you will advise your operating personnel to cooperate with the Humble Gas dispatchers in the future in order to carry out the provisions of our formal notice of the need to cur-

tail or discontinue deliveries under our Gas Sales Agreement.

In addition you agreed to proceed to obtain another supply of gas for the Natchez Generating Plant and in this connection we agreed to hold our offer open to terminate the existing agreement at the earliest date possible. Our offer to convert the existing agreement into an interruptible contract also remains open in the event you desire to elect that course of action.

We appreciate very much the opportunity to meet with you to discuss our mutual problem and we appreciate your cooperation under the circumstances.

Humble *promised* to hold open its offer to terminate at the earliest possible date in return for MPL's promise to proceed to obtain another supply of gas. The letter also reiterated an offer which had been repeatedly rejected by MPL, i.e., to convert the existing agreement into an interruptible contract.[8]

Humble also attacks as clearly erroneous the district court's finding that Valley constituted "another supply" of gas within the meaning of the termination agreement.[9] The court held:

> Nothing was said in such agreement [of November 22] by either party to indicate that such supply of natural gas had to come from a different source, or could not come from Mississippi Valley Gas Company because it got its gas from plaintiff [Humble]. No such restriction or limitation was contained in such oral agreement of the parties which surely had a valua-

ble consideration moving to each party from it.

Humble does not argue that the parties explicitly excluded Valley from consideration as "another supply" of gas. Humble explains that it wanted to terminate the contract in order to get MPL off the Fowler-Baton Rouge line and that, in effect, MPL is still on the line, receiving Humble's gas at bargain-basement prices. Thus, it contends that MPL *must* have understood that Valley was not "another supply" of gas. MPL responds that no understanding of this nature was ever reached; that it has reduced Humble's daily obligation on the line by 20,000 MCF by terminating the contract;[10] that it now has an interruptible, uncertain supply source through Valley; and, that natural gas on an interruptible basis is always cheaper.

The most that can be said in Humble's favor is that there is a clear conflict in the evidence on this point. Our conces-

8. Several of Humble's contentions are predicated on its interpretation of the events of November 22, 1968 and the effect of the subsequent letter of November 25. Our affirmation of the district court's findings renders these contentions meritless. Thus, Humble erroneously argues that neither of its "alternative offers" were accepted before they were revoked; that the parties did not intend to enter into an agreement to terminate on November 22; and, that Humble received no consideration for its "offer" to terminate.

9. The district court observed that Humble's contentions concerning the specific terms of the agreement may have been induced by a substantial change in position since this controversy began. Additional sources of supply have now been acquired for the Fowler-Baton Rouge line so that Humble's obligation to MPL under the '49 contract could now be met. This appears particularly aggravating since MPL is getting enough gas from Valley to operate the Natchez station and the gas is much cheaper than if purchased from Humble. The district court noted:

> The agreement of the parties for the termination of this gas supply contract said nothing about any reporting of progress, or about any acceptance or rejection further than was actually agreed upon by the parties at the time

of such conference. That seems to be an afterthought of the plaintiff [Humble] since it has secured an additional supply of natural gas which it would now like to sell the defendant [MPL] at such higher price.

10. The district court found in this respect: The plaintiff [Humble] vigorously and very forcefully contends here that even though it were relieved of its 20,000 m. c. f. daily commitment of gas to defendant that nothing was thereby accomplished toward relieving it of the strain on its system during peak periods of service. It may not be gainsaid that its oral agreement with defendant [MPL] to terminate the contract in suit had a legal consideration as well as a valuable one therefor. Under the sole remaining contract, the plaintiff has no obligation to furnish defendant any natural gas whatsoever—its 20,000 m. c. f. commitment to the defendant was terminated when defendant found another supply of natural gas on which it was willing to rely in the place and stead of such commitment from the plaintiff. Now, defendant will receive only so much natural gas at its Natchez plant as is available to it within the maximum daily limits of plaintiff's commitment to Mississippi Valley Gas Company.

sion is of little value, however, since we may not reverse the decision of the district court unless "clearly erroneous." [11] The Supreme Court defined this term in United States v. United States Gypsum Co.: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." [12] Humble has vigorously and thoroughly argued its position and we have carefully and earnestly studied the record but the evidence in this case does not leave us with a "definite and firm conviction that a mistake has been committed."

█ To paraphrase the district court, the parties agreed to terminate the '49 contract when MPL obtained another supply of gas. Humble promised to hold open its offer to terminate, and MPL promised to proceed to obtain another supply of gas. No limitations on the source of supply were made. The '49 contract was terminated when MPL accepted Valley's offer to supply natural gas to the Natchez station.

Affirmed.

---

11. Rule 52(a), Fed.R.Civ.P.

12. 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1947). *See* Chaney v. City

of Galveston, 368 F.2d 774, 776 (5th Cir. 1966) ; Cedillo v. Standard Oil, 291 F.2d 246 (5th Cir. 1961).